[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a termination of parental rights proceeding initiated by the Department of Children and Families (DCF). The subject minor child, Jessica Lynn B., was born on September 24, 1993. Her biological parents, Donna S. and Stephen G.[1], were named as the respondents in this action. (Donna S. and Stephen G. were never married to each other).
Pursuant to the applicable subsections of C.G.S. § 17a-112
(b), the petitioner alleged the following three statutory grounds for termination against each parent: abandonment, parental failure to rehabilitate, and lack of an ongoing parent-child relationship). DCF also alleged, with respect to both respondents, that each ground for termination had existed for more than one year.
PROCEDURAL CONTEXT
DCF took custody of Jessica Lynn pursuant to an administrative "96-hour hold" on September 24, 1993, the day the child was born. On September 28, 1993, the petitioner filed neglect and uncared for petitions and sought an ex parte order of temporary custody, which the Superior Court for Juvenile Matters in Montville granted on that date. DCF alleged that Donna S. had intellectual and neurological deficits which prevented her from appropriately caring for her infant daughter, and that the child would be denied proper care and attention physically, educationally, emotionally or morally. Jessica Lynn was adjudicated a neglected child and committed to DCF custody by the Montville court on June 15, 1994. This commitment was CT Page 9462 subsequently extended by the court in Montville on December 11, 1995. On December 18, 1996, during a hearing before this court, the parties through counsel agreed to an additional one year extension of commitment, pending the outcome of the termination trial and without prejudice to the right of any party. DCF filed termination petitions at the Montville court on January 18, 1996. The case was subsequently transferred to this venue for a contested termination of parental rights hearing.
Trial in this matter commenced on October 8, 1996 and was continued on various dates thereafter until it concluded on March 27, 1997. Donna S. was present in court on each day of the trial. She was represented by her counsel, and assisted by her court-appointed guardian ad litem throughout the proceeding. Stephen G. did not attend the trial, but he was represented by his attorney during the entire trial. DCF and the minor child were also represented by their respective counsel throughout the trial.
On October 10, 1996, after trial commenced and the court had received some testimony, the court ordered a psychiatric evaluation of the respondent in order to determine her competency to understand the nature of the proceedings and effectively assist her counsel. The court made this order on its own motion, after receiving evidence that Donna S. suffered from mental impairment. The trial was suspended and Walter Borden, M.D., a forensic psychiatrist, was appointed to conduct the competency evaluation. The court ordered that the evaluation was solely for the purpose of determining the respondent's ability to understand the proceeding and assist her attorney, and also ordered that information gleaned during the evaluation would be inadmissible in the case in chief.
Dr. Borden conducted his evaluation and testified in court on December 18, 1997. He testified that Donna S. had a basic understanding of the nature of the termination proceedings, but was not competent because she could not effectively assist her counsel. Dr. Borden stated that the respondent becomes disorganized when she becomes anxious, or is under stress. At such times, her ability to communicate with her lawyer is impaired. The psychiatrist opined that the mother needed the assistance of someone at trial who could help calm her during periods of stress and who could explain things to her in simple, concrete terms. He added that this type of assistance would possibly make her competent. Dr. Borden's report under date of CT Page 9463 November 18, 1996 was introduced into evidence at the December hearing (Court's Exhibit 1). It noted: "In conclusion, Donna on her own is not fully competent to assist counsel during the upcoming hearing. However, with the assistance of her mother-in-law or someone who can take a similar assisting role, it is possible that competence could be achieved." (Court's Exhibit 1, Page 2).
Following this hearing, the court again continued the matter, and requested that Dr. Borden meet with the respondent, her mother-in-law, her husband and her guardian ad litem to ascertain if either of the relatives, or the guardian ad litem, could properly assist Donna S. at trial. Dr. Borden met with the husband, William S., and with Gary A., a family friend who resides with the respondent and her spouse. The mother-in-law, Felicidade S., was not interviewed, since she indicated that she would not be able to assist Donna S. in court. Dr. Borden also met with Attorney Barbara Claire, the mother's guardian ad litem. A second competency hearing was held by the court on February 7, 1997. Dr. Borden testified at that proceeding, and submitted a second report, which was received into evidence as Court's Exhibit 2. He noted therein that his "[r]eview of complex factors indicates that members of the household, including [respondent's] mother-in-law, her husband and [Gary A.] would not be appropriate in regard to assisting her in court proceedings." He also added: "Furthermore, it is probable that she would not be competent even if outside assistance was obtained because her residence in that household places her under the dominion of her husband. In my opinion that fact alone would substantially interfere in her being able to take independent action in terms of participating in court proceedings, regarding her own and her child's best interests. Her mental retardation involves such suggestibility and inability to take independent action that the family influences constitute a major obstacle." (Court's Exhibit 2, Page 2). Dr. Borden did not observe interaction between Donna S. and Attorney Claire, the guardian ad litem. However, he testified on February 7th that it was possible that the GAL could appropriately assist the respondent mother at trial.
At the conclusion of the hearing on February 7th, counsel for Donna S. made an oral motion for mistrial based on the finding by Dr. Borden that the mother was incompetent, and on the fact that the court had already heard testimony before the competency issue was raised in October. The court denied the motion for mistrial. The court is mindful of the Connecticut Supreme Court's ruling in CT Page 9464 the termination case of In Re Alexander V. 223 Conn. 557,613 A.2d 780, (1992). That case deals extensively with the issue of procedural due process safeguards for respondents who may be mentally incompetent. After considering Dr. Borden's reports and testimony at the competency hearings, the court ordered that all counsel would be supplied at state expense with transcripts of the testimony already received into evidence during the trial. These were made available in order that Donna S.'s counsel and guardian ad litem could review all of the prior testimony with their client. The court requested that the Attorney Claire, the guardian ad litem, provide the respondent with the assistance at trial recommended by Dr. Borden.
The court indicated that the GAL should ask for recesses or interruptions of the trial whenever she felt they were necessary in order to make explanations to the respondent, or to otherwise facilitate her ability to understand the proceedings and assist her counsel. The record of the trial will reflect that the guardian ad litem did, on several occasions, request time during the trial to confer with Donna S., or to explain something to her. These requests were always granted by the court. Given the specific nature of the respondent's incompetency — and in light of Dr. Borden's opinion that situational circumstances beyond the court's control made complete remediation unlikely — the court believes that the steps taken were the most appropriate procedural safeguards available to the court. The court also indicated to both Donna S.'s lawyer, and her guardian ad litem, that they should feel free during the course of the trial to suggest any other accommodations or methodologies which they believed would help protect the mother's due process rights, or enhance her ability to participate in the hearing.
The trial resumed on March 25, 1997 and ended on March 27, 1997. The petitioner introduced a total of 15 documents as full exhibits into evidence, as well as the testimony of the following witnesses:
1. Mary Dunion, DCF social worker;
2. Bruce Freedman, Ph.D., psychological evaluator;
3. Daniel Vendetto, adult probation officer;
4. Lisa O., the child's foster mother; CT Page 9465
5. Christopher O., the child's foster father.
The respondent mother offered 18 full exhibits into evidence and produced the following witnesses at trial:
1. Felicidade S., her mother-in-law;
2. Gary A., a friend;
3. William S., her husband.
Through their respective counsel, the respondent father entered two exhibits into evidence, and the minor child submitted five exhibits.
FACTUAL FINDINGS
The court, having carefully considered all of the evidence and testimony presented at trial, makes the following factual findings:
Jessica Lynn was born on September 24, 1993 at the Backus Hospital in Norwich. After the child was delivered, hospital staff requested a "96-hour hold" on the child's custody, due to their concerns that the mother's intellectual limitations prevented her from appropriately caring for the child. On September 28, 1993, DCF applied for and received an ex parte order of temporary custody from the Superior Court for Juvenile Matters in Montville. DCF also filed neglect petitions concerning Jessica Lynn with the court on that date. The child, then five days old, was placed in a foster home in Mystic, Conn. on September 28th. She has resided continuously in this foster home from that date through the present.
Jessica Lynn was adjudicated a neglected child at the court in Montville on June 15, 1994, and was committed to the petitioner's care and custody for a period not to exceed 18 months. Court approved expectations (with respect to the respondent Donna S., only) were entered at that hearing. Those expectations were signed by Donna S., her counsel, and her guardian ad litem. They provided that the mother would keep all appointments set by or with the petitioner, keep her whereabouts known to DCF and her counsel, visit the children as often as DCF permits, participate in individual counseling, obtain assessments and tests necessary for Department of Mental Retardation CT Page 9466 services, secure and maintain adequate housing and income, refrain from substance abuse and involvement with the criminal justice system, and cooperate with services offered or referred to her by DCF, including parent aid services. (Petitioner's Exhibit 3.)
Donna S. has a full-scale IQ of 59 and is mildly to moderately mentally retarded. She has great difficulty reading and writing. Donna S. was evaluated several times between 1993 and 1996 by Bruce Freedman, Ph.D., an evaluator appointed by the court. Doctor Freedman, a licensed clinical psychologist, first interviewed the mother on November 8, 1993. His written report concerning that evaluation noted in part:
 "[Donna S.] is a woman who showed mentally retarded intellectual functioning, and many specific deficits in mental functioning. She had significant problems in conceptual functioning, in handling time, time sequences, problems in memory, severe problems in judgment and judgments about people, problems in handling numbers and in understanding social interaction. Donna would not be mentally capable of caring for a child, and serious problems were noted even in the protected setting of the hospital where the baby was born." (Petitioner's Exhibit 13, Page 3).
Dr. Freedman's last evaluation of Donna S. was conducted on April 30, 1996. his findings then were very similar to the ones he made nearly three years earlier:
 "[Donna S.] showed mental retardation in the mild-moderate range. She showed substantial mental limitations which would affect her ability to manage both daily tasks and parental skills. She showed continued poor judgment in her choice of men, she seemed unable to be without a man, and each man she had chosen had appeared to be irresponsible, physically abusive, neglectful at times, and eventually abandoned her. On her own, [Donna S.] would not have the common sense, intelligence and judgment to care for herself and her basic needs, or to provide for a growing child." (Petitioner's Exhibit 16, Page 5).
Based on Dr. Freedman's testimony, the court finds that the mother's mental limitations are long-term and unlikely to improve appreciably in the future. The psychologist opined that the only way Donna S. could adequately care for the child would be if she CT Page 9467 established a living arrangement with another adult who would competently fulfill the role of Jessica Lynn's primary, full-time caretaker. The court finds the psychological evaluator's evaluation reports and testimony to be credible, and attaches great weight to his findings and recommendations in this matter.
Dr. Freedman interviewed the father, Stephen G., as part of his court-ordered evaluation on May 16, 1994. Stephen G. provided the psychologist with an account of his relationship with Donna S., and also related details about the mother's series of chaotic and unhappy relationships with other men. (See Petitioner's Exhibit 15). Stephen G. met Donna S. in a bar, and the couple lived together for a period of time. They have a daughter, Elizabeth, who was born on June 10, 1992. According to Dr. Freedman's report, the relationship between Stephen G. and Donna S. was near its end by the time Elizabeth was born. Shortly after the child was born, Stephen G. moved out of the apartment which he was sharing with Donna S. and relocated with Elizabeth to another apartment in the same building. He took custody of Elizabeth with the mother's acquiescence and the child has remained with him ever since.
Paternity tests administered in February 1994 indicated a 99.59 per cent probability that Stephen G. is Jessica Lynn's biological father. (Petitioner's Exhibit 4). He acknowledged that he was the father and began weekly visits with the child after the paternity issue was resolved. Dr. Freedman's psychological evaluation report in May of 1994 indicated that Stephen G. "faithfully attended all allowed visits." (Petitioner's Exhibit 15, Page 3). At that time, Dr. Freedman believed that Stephen G. might be an appropriate candidate for Jessica Lynn's custodian. The psychologist wrote in his report of the May 1994 evaluation:
 "In fact, [Stephen G.] seemed a good potential custodian for Jessica. He related well to her, showed knowledge of children, and appropriate awareness of signs of her developmental delays. He was affectionate and attentive with her, handled [and] cared for her well, and seemed to have a good, established relationship with her." (Petitioner's Exhibit 15, Page 5).
In September 1994, Stephen G. married Donna S.'s sister, Debra. In October 1994, he moved with his new spouse and his daughter Elizabeth to South Carolina, where he has apparently remained through the date of this trial. The father's whereabouts CT Page 9468 were unknown to DCF from October 1994 until March 1996. Stephen G. has had no visits with Jessica Lynn since July 1994, and he has not mailed cards or gifts to the child through DCF or the foster parents since departing from Connecticut. Stephen G. did not attend this trial, although he was represented by counsel throughout the proceeding. In correspondence dated April 1, 1996, which was admitted into evidence during trial, Stephen G. claimed that he left Connecticut because professionals associated with this case informed him that he would not be awarded custody of Jessica Lynn. (See Respondent Father's Exhibit A). Stephen G. stated in this letter that he objects to the TPR and desires to raise Jessica with her sister, Elizabeth.
During April 1996, the father's counsel filed a motion with the Superior Court for Juvenile Matters in Montville, requesting that an interstate compact study of Stephen G.'s suitability as a potential custodian for Jessica Lynn be undertaken by child welfare officials in South Carolina. The court (Driscoll, J.) denied this motion. By the time that this request was made, Stephen G. had been continuously absent from Jessica Lynn's life for approximately 20 months. Dr. Freedman testified during this termination trial that the child would not now know her biological father, since he left Connecticut when she was only one year old. He also offered the opinion, which the court accepts as credible, that no parent-child bond exists between Stephen G. and Jessica Lynn.
At some point (the precise date is unclear to this court), Donna S. began a relationship with William S. William S. testified during trial that he has known Donna S. since 1991, had sexual relations with her around the time that Jessica Lynn was conceived, and began living with her in Norwich, Conn. in January 1994. He married Donna S. on May 3, 1994, and they have a daughter, Anne, who was born on October 3, 1995. For reasons which will be set forth herein, the mother's relationship with her current husband became a major focal point in this trial.
When Jessica Lynn was committed to DCF on June 15, 1994, court-approved expectations were signed. (Petitioner's Exhibit 3). One of the expectations to which the respondent mother agreed was that she would cooperate with parent aid services provided by DCF. Evidence presented at trial indicates that DCF referred Donna S. to the New London County Parent Aide Program on February 28, 1994. (Petitioner's Exhibit 10). The case manager from that agency wrote to DCF on August 29, 1994 that the program was CT Page 9469 unable to provide services because the family refused, or was unavailable for services. The correspondence stated: "Due to no phone a letter was sent to the client requesting them to call if they were interested in services — they did not call." (Petitioner's Exhibit 10). There was no evidence that this letter was actually received by the respondent. Additionally, as noted at length herein, Donna S. suffers from severe intellectual limitations. She has difficulty reading, and relies on William S. to explain the correspondence which she receives. Although DCF referred the respondent to a parent aid program as promised, the petitioner's follow-through in attempting to connect the respondent with that service was deficient. Under the circumstances, the mailing of a single letter to a person with severe learning disabilities was inadequate notice. DCF or the service provider should have followed up with a visit, or other attempt to personally contact the respondent, and ascertained whether or not she was amenable to the assistance of a parent aid. Based on the forgoing, the court will not find that the respondent's failure to participate with the parent aid program constituted evidence of her unwillingness or inability to cooperate with DCF-sponsored reunification services.
In August 1994, William S. moved with his wife to New Bedford, Massachusetts. The couple has resided there since that time in a home owned by William S.'s mother. William S. testified that he moved to Massachusetts with his wife in order to remove Donna S. from a stressful family situation and members of her family who were harassing her. At that time, William S. was on probation in Connecticut as the result of his conviction for the felony crime of risk of injury to a minor. He was convicted of that offense in 1989[2] and served three years in prison before beginning his probation. One of the terms of his probation, which did not end until 1996, was that he not relocate from the state of Connecticut without the permission of his probation officer. Frank Vendetto, a Connecticut adult probation officer, testified in this proceeding that he never gave William S. permission for extended visits to Massachusetts. He claimed that on one occasion he checked an address in Norwich where William S. was supposed to be residing, and found both William and Donna S. at the premises. The probation officer did not violate William S. for relocating to Massachusetts. William S. gave inconsistent testimony during this trial about his relocation out of state. At one point he testified that Connecticut probation officials were aware of the move to Massachusetts. However, he also testified that he did not tell his probation officer about the relocation because he was CT Page 9470 maintaining residences both in Connecticut and Massachusetts. The court found William S.'s testimony about this relocation to be evasive and lacking in credibility. DCF was aware that Donna had moved to Massachusetts. It is clear, however, that the move to New Bedford greatly minimized the petitioner's ability to monitor Donna's situation, and provide her with supportive services.
William S. resides on the second floor of the New Bedford residence with Donna S. and their daughter Anne. William's mother, Felicidade S., owns the house and lives of the first floor. Gary A., a former roommate of Donna S. and a friend of both William and Donna, lives in a room on the third floor. William S. and Gary A. both have criminal records in Connecticut. (See Petitioner's Exhibits 17 and 20). In addition to his conviction for risk of injury to a minor, William S. has received convictions in this state for burglaries, larcenies, and a count of reckless endangerment. Gary A. received a; suspended sentence and probation in July 1990 following his conviction in Connecticut for risk of injury to a minor. He received a sentence of 15 years, suspended after three years incarceration, with five years probation, following 1982 Connecticut convictions for the crimes of arson second degree, and burglary third degree. Gary A. is not employed and testified at trial that hopes to relocate "out west" this summer. William S. does not have full-time employment but works odd jobs at various trades. There is an extensive electronic intercom system in the house in order that William S., William's mother, and Gary A. can assist Donna S. with the care of Anne.
Donna S. has had supervised visitation with Jessica since the child was discharged from the hospital. After they moved to New Bedford, Donna S. and William traveled to Connecticut to visit the child. The trip took approximately two and a half hours each way. For the first two year's after Jessica Lynn was placed in foster care, the mother visited regularly. However, from May 1995 through the end of October 1995, the mother did not see Jessica. DCF social worker Mary Dunion testified that William S. told her that Donna S. was experiencing difficulties with her pregnancy and had been restricted from travel by her physician. The social worker responded that if Donna S. provided an authorization that enabled DCF to confirm her medical problems, she would make arrangements to transport Jessica to New Bedford for visits. William S., who testified that he holds a power of attorney from Donna S., promised to forward the authorization and a physician's written verification of his wife's condition to DCF, but never CT Page 9471 did so. (See Petitioner's Exhibit 7 and 8). The social worker testified that in a brief conversation with Donna S.'s physician, the doctor indicated that he had not placed any restrictions on the mother's travel. The visitation resumed in October 1995, and during the period of time which transpired prior to January 18, 1996, the respondent made fairly regular trips to Connecticut for visitation with Jessica Lynn.
One of the exhibits which was offered into evidence at trial contained DCF narrative accounts of Donna S.'s supervised visits with the child. (Respondent Mother's Exhibit A). A number of the entries indicated that these supervised visits went well, and that the mother was appropriate in her handling of the child. Others, however, reflect the lack of judgment, common sense and parenting skills to which Dr. Freedman referred in his evaluations. On March 2, 1994, Donna S. put her fingers, which appeared to have dried blood on them, in the baby's mouth. (Respondent Mother's Exhibit A, Page 7). The social services aid had to admonish the respondent not to do this. During a visit on May 23, 1994, the mother brought a bottle of spoiled milk which had a "brown spot" in it to feed to Jessica Lynn. When the social service aid informed the mother that she shouldn't give spoiled milk to the baby, Donna S. responded that her husband Bill had prepared the bottle. (Respondent Mother's Exhibit A, Page 12). During another visit on September 13, 1994, Jessica — then 11 months old — cried while being handled by the respondent. Donna S. called her daughter a "sh__ head" and told her to "knock off the attitude." (Respondent Mother's Exhibit A, Page 14). Additional narrative entries detailed other instances where the mother called the infant derogatory names and attempted to inappropriately feed the baby.
Donna S.'s relocation to Massachusetts prevented DCF from providing the mother with services in Connecticut. Despite this limitation, DCF made attempts to facilitate services for Donna S., and her husband. As noted above, the petitioner offered to transport Jessica Lynn to Massachusetts, upon receiving verification of the medically-related travel restriction. Donna S. had contacts with Massachusetts DMR, and it was hoped this agency would provide assistance.
Additionally, in a letter under date of August 16, 1995, social worker Mary Dunion wrote to the mother that:
"I've enclosed a brochure from the Center for Health CT Page 9472 and Human Services, Inc. in New Bedford that might be of interest to you. The Center also offers a Parenting Group on Tuesdays from 1-2 p.m. Should you be interested in counseling services, New Bedford Child and Family Agency can be contacted at 996-8572. Child and Family may also offer parenting support groups. You can contact both of the above on your own if you are interested." (Petitioner's Exhibit 8).
William L. acknowledged during trial that he had received Ms. Dunion's August 16, 1995 letter, and indicated familiarity with the service providers referred to in the correspondence. He admitted during his testimony that neither he nor his wife contacted the agencies listed. When asked why not, the husband replied with an evasive answer. William S. indicated that he didn't believe that the agencies listed in Ms. Dunion's letter were what DCF was looking for, because the service providers were not located in Connecticut.
In a March 10, 1995 letter to the mother, the DCF worker responded to a request by William S. for information about agencies that provide sexual offender's evaluation and treatment. (Petitioner's Exhibit 6). Ms. Dunion directed William S. to two agencies — one in Willimantic, Conn. and the other in New Bedford, Mass. There was no indication at trial that William S. ever contacted either agency.
Evidence presented at trial established that Donna S. was unaware when she married in May 1994 of the allegations which resulted in her husband's risk of injury to a minor conviction. On June 22, 1994, the mother signed a document at DCF which indicates that she had only recently learned about the matter. The document, which was prepared by a DCF social service aid and signed by Donna S. states:
 "I'd like to make it known that I DO NOT want [William S.] in any of my visits with my daughter. . . .I do not want Bill to have any kind of contact with my daughter. The fact being that I found out last night 6/21/94. . . .that Bill molested his step-daughter (name unknown). Therefore, I repeat; I DO NOT want [William S.] in any visits with my daughter. Ever." (Petitioner's Exhibit 5).
Donna S. subsequently rescinded the request that her husband be prevented from visiting Jessica Lynn and she moved to CT Page 9473 Massachusetts with William S. in August 1994. This was less than two months after she signed the above-mentioned document.
In October 1994, Donna S. requested that DCF solicit an interstate compact study through the Massachusetts child welfare agency. The purpose of this study was to examine the possibility of returning Jessica Lynn to live with William S. and her in their New Bedford residence. DCF initially agreed to request the study, but subsequently reversed its position and declined to ask for the Massachusetts investigation. DCF social worker Mary Dunion testified that DCF changed its mind due to the husband's risk of injury to a minor conviction, which stemmed for an allegation that he had sexually molested a child. Donna S. appealed DCF's refusal to request the study, and the decision was later upheld at an administrative appeal hearing conducted by the agency.
There was evidence at trial that the relationship between Donna S. and William S. has been marked by discord at times. In April 1995, Donna S. informed Ms. Dunion that William S. would leave her alone for several days at a time. In November 1995, the respondent mother told the social worker that her husband had hurt her, and that the mother-in-law, Felicidade S., had witnessed this. Donna S. told the worker that William S. had hit her and would pin her in a chair. Donna S. gave a similar account to Dr. Freedman when he evaluated her approximately five months later. Dr. Freedman's written report noted:
 "[Donna S.] agreed with previous claims that [William S.] had taken her SSI money and been gone for days at a time, and when pressed, she agreed that he sometimes yelled at her and hit her. She said that he would slap her hard at times, and that she had to be ready and prepared when they argued so that she could protect herself. She provided this information about domestic violence only when pressed, and she repeatedly expressed concern that he might read the statements she made. Once again Donna was clearly torn between different ideas, found it impossible to handle all the ideas at once, so that she made contradictory and self damaging statements in different ways. Donna said that [William S.] sometimes smashed and broke things, that he put a hole in the wall, in addition to sometimes striking her." (Petitioner's Exhibit 16, Page 2).
William S. testified during the trial that he believes his CT Page 9474 wife to be honest, but he denied ever striking or assaulting her. He pointed out that he and his wife had not been the subject of any domestic violence complaints to the New Bedford Police. Although he denied being physically abusive to his wife, he admitted that he has physically restrained Donna S. on more than one occasion when she became upset. He recounted an incident when the respondent was upset concerning some of her relatives and began "taking it out" on everything around her. William S. claimed that when Donna S. becomes upset she lashes out, breaks things, and inferred that she has the potential to hurt herself or others. He testified that he has restrained Donna S. in order to prevent her from hurting herself, their daughter Anne, and him. His mother, Feliciade S., and Gary A. testified that they did not witness William S. engage in any acts of domestic violence towards Donna S.
The court finds that their have been acts of physical violence between Donna S. and her husband, and that their relationship has been volatile at times. Examined in its most favorable light, William S.'s testimony indicates that the respondent has become so enraged on occasion that it has been necessary for him to employ physical restraint in order to protect other household members, including their young child. However, the court is not persuaded that the husband's acts have been limited to purely defensive measures. Donna S. told the DCF social worker in April 1995 that she had been hit by William S. She made a similar accusation five months later, during the psychological evaluation conducted by Dr. Freedman. The fact that the respondent gave essentially the same information to two different professionals on separate dates, months apart, lends credibility to Donna S.'s accounts. Furthermore, her reluctance to talk about the episodes, the fear of William S. which she expressed to Dr. Freedman, and the respondent's statement that she has to be prepared to defend herself when she argues with her husband, all lead the court to conclude that Donna S.'s claims about domestic violence are truthful.
During the trial, William S., his mother, and Gary A. also testified on behalf of the respondent that Donna S. was independently capable of caring for Jessica Lynn. In summary, the three witnesses claimed during their testimony that the respondent successfully cares for her daughter, Anne, and could appropriately function as Jessica Lynn's primary caretaker. The court ascribes little weight to that testimony. As noted above, the court has accepted Dr. Freedman's professional opinion that CT Page 9475 Donna S. would be unable, by herself, to appropriately care for a child of any age. The psychologist's evaluations, as well as accounts of the mother's behavior, including that observed during some of the supervised visits, convince the court that Donna S. is incapable of appropriately caring for a child without the supervision and constant assistance of another competent adult.
 ADJUDICATION AS TO STEPHEN G. (Based on facts as of January 18, 1996)
 1. Abandonment: Stephen G. claimed through his counsel at trial that he was opposed to the termination of his parental rights and wished to parent Jessica Lynn. Unfortunately, his conduct since October 1994 belies that assertion. The biological father initially visited the child and participated in a court-ordered psychological evaluation. Dr. Freedman then believed that Stephen G. might be an appropriate custodian. However, Stephen G. relocated to South Carolina in October, 1994 and has had no visits or contacts with Jessica Lynn since then. He did not attend this trial. Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 438 A.2d 801
(1981); In re Migdalia M., 6 Conn. App. 194, 209, 504 A.2d 532
(1986). The petitioner has proven by clear and convincing evidence in this case that Jessica Lynn was abandoned by the biological father, in that he has failed to maintain a reasonable degree of interest, concern or responsibility as to her welfare. See C.G.S. § 17a-112 (b)(1). The court also finds that this statutory ground for termination of parental rights has existed for a period of time well in excess of one year prior to the date when the termination petitions were filed.
2. Parental failure to rehabilitate: C.G.S. § 17a-112 (b)(2) sets forth the criteria for this ground for termination of parental rights. The statute applies in those cases where:
 "the parents of a child who has been found by the superior court to have been neglected or uncared for have failed to achieve such degree of personal rehabilitation as would encourage the belief within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." CT Page 9476
Jessica Lynn was committed to DCF as a neglected child on June 15, 1994. Stephen G. acknowledged paternity, began visitation with the child, and participated during May 1994 in Dr. Freedman's psychological evaluation. The biological father went to South Carolina in October 1994, and his whereabouts were unknown to the petitioner for approximately 17 months thereafter. He dropped out of the child's life completely and has had no contact with her in more than two and one half years. His undisclosed departure from Connecticut prevented the petitioner from providing rehabilitative or reunification services to the respondent. Stephen G. has done nothing to habilitate a relationship with Jessica Lynn since October 1994, and it would be totally adverse to the best interests of this young child to allow him any further time to do so. The petitioner has proven by clear and convincing evidence that this ground for termination has continuously existed since October, 1994.
3. No on-going parent child relationship: C.G.S. § 17a-122
(b)(4) defines the lack of an on-going parent-child relationship to mean the absence of the relationship which develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of a child." This court is well-aware of the decision of our Supreme Court in the case of Inre Valerie D., 223 Conn. 492, 613 A.2d 748 (1992). That case holds that C.G.S. § 17a-112 (b)(4) may not apply in many cases where the parent's failure to habilitate a parent-child relationship results from the state's assumption of the child's custody shortly after birth. This court finds, however, that the facts of this case as they apply to the biological father are distinguishable from those of the Valerie D. matter. Before Stephen G. voluntarily left this state, he was visiting the child, and Dr. Freedman at one time considered him to be a potential custodian. He had the chance at that time to facilitate a relationship with Jessica Lynn and possibly obtain her custody. Since then, however, he has in essence turned his back on the child by failing to visit or contact her. Dr. Freedman has testified that the child would not now know Stephen G. Given the father's voluntary decision to absent himself totally from Jessica Lynn's life since October 1994, the court finds that he has failed to establish an ongoing parent-child relationship with his daughter. Accordingly, DCF has proved by clear and convincing evidence this non-consensual ground for termination of parental rights. The petitioner also established by clear and convincing evidence that the lack of an ongoing parent-child relationship has existed for a period of time in excess of one year, and that CT Page 9477 it would be detrimental to the best interests of the child to allow Stephen G. further time for the establishment, or re-establishment, of such a relationship.
 ADJUDICATION AS TO DONNA S. (Based on facts as of January 18, 1996)
 1. Abandonment: The petitioner did not prove this allegation against Donna S. by clear and convincing evidence at trial. The statutory language of C.G.S. § 17a-112 (b)(1) requires DCF to establish that the respondent failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare. Viewed in its totality, the testimony and evidence showed that from August 1994 until approximately May of 1995, Donna S. made regular visits from New Bedford to Connecticut to see her daughter under DCF supervision. The respondent made the round trip, which took at least five hours, to see her child for a visit that did not exceed an hour and a half. There was a hiatus in visitation by the mother from approximately May of 1995 through October 1995. It is apparent to the court that William S. was deceptive in his representations to DCF that the respondent had been prohibited from making the journey by her physician, and that he would provide the agency with documentation of this, and an authorization to contact the mother's doctor. Nonetheless, the court also finds that the respondent was pregnant with her daughter Anne at this time, and that the visits with Jessica Lynn resumed after the new baby was born in October 1995. From October 1995 until the date when the termination petitions were filed, the mother was fairly compliant with visitation expectations. There was evidence that the respondent did not send cards or gifts to Jessica Lynn. But the court also notes that the respondent demonstrated parental interest by requesting an interstate compact custody study of her situation in Massachusetts, and by initiating some telephonic contact with Jessica Lynn in the foster home. Based on all of the forgoing the court finds that Donna S. did not abandon her child for a period of time in excess of one year prior to January 18, 1996. Accordingly, that count of the termination petition against Donna S. is hereby dismissed.
2. Parental failure to rehabilitate: As employed in C.G.S. § 17a-112 (b)(2), the term personal rehabilitation has been defined by Connecticut case law to mean the restoration of a person to his or her former constructive and useful role as a parent. In re Migdalia M., supra, 203. A parent is not required CT Page 9478 to assume full-time custody of a child, and may rely on available support systems, since playing a "responsible position" in the life of the child is not necessarily the same thing as being a full-time caretaker. In re Migdalia M., supra, 203.
This court is very mindful that many persons who are confronted with serious physical or psychological challenges successfully parent their children. It is axiomatic in cases such as this one that the court's scrutiny must focus on a parent's conduct and fitness, and not on his or her disability.
The reports and testimony of Dr. Freedman, and other evidence concerning Donna S.'s behavior, judgment, social skills and parental capabilities, all prove by clear and convincing evidence that she is incapable by herself of achieving the degree of personal rehabilitation necessary to assume a responsible position in Jessica's life. Dr. Freedman noted in his April 30, 1996 evaluation of the respondent that:
 "Donna was an extremely dependent woman, who has never been without a man's company, would require the help of another adult to manage any child and probably her own life, outside of a sheltered living situation." (Petitioner's Exhibit 16, Page 3).
As suggested by Dr. Freedman, the court finds that the mother's successful rehabilitation hinged on her ability to establish a competent parental and personal support system. This might have been accomplished through a congregate or group living program, or through her association with friends or other helpful adults. It is clear that she requires the intensive assistance of one or more responsible adults to provide for Jessica Lynn's primary care. It is also apparent that the respondent needs this type assistance to conduct her own life in fashion that would enable her to appropriately function in a responsible non-custodial role.
Jessica Lynn has been in state foster care for more than three and one half years. Sadly, the support system which Donna S. has established since then is inappropriate, and has prevented her from achieving the requisite parental rehabilitation. She resides in a house with William S. and Gary A., both of whom have been convicted for risk of injury to a minor offenses, and other serious crimes involving dangerous illegal activities. Dr. Freedman opined during this trial that William is a "potentially CT Page 9479 dangerous individual" who displayed some of the signs of an anti-social personality disorder. He based these opinions on William S.'s history of juvenile delinquency, his previous behavior problems including the criminal convictions referred to above, and the allegations that he physically abused Donna S. and took advantage of her. Dr. Freedman testified that William S. was not qualified to serve as the adult who would help the respondent mother to support her child. He also expressed the opinion that Donna S. would not be able to protect Jessica Lynn from William S.
It was established by clear and convincing evidence at trial that the relationship between William and Donna has at times been both unstable and volatile. The evidence and testimony also indicated that William S. controls his spouse, has left her alone for several days at a time, and has been physically abusive towards her on occasion. Based on the evidence adduced at trial, including William S.'s own testimony, the court also concludes that the husband harbors a distrust for DCF, has attempted to deceive DCF and other agencies, and would not be likely to work cooperatively with social service agencies attempting to assist Donna S. The court also finds that despite the mother's relocation to Massachusetts, DCF made attempts to direct the couple to appropriate rehabilitative services in Massachusetts. With the exception of some contacts that Donna S. had with the Massachusetts Department of Mental Retardation, the respondent has not followed through with the services in that state.
Based on all of the forgoing, the court finds that the petitioner has satisfied its burden of proving by clear and convincing proof that Donna S. has failed to rehabilitate as alleged in the termination petition, and that she is unlikely to do so within a reasonable time in the future.[3] Given the ages and needs of the child, the protracted length of time she has already spent in state custody, and the complete factual history of this case, the court also finds that it would be detrimental to Jessica Lynn's best interests to allow the respondent mother any further time to pursue rehabilitative efforts. The court also finds as proven by clear and convincing evidence that this statutory ground for termination of parental rights has existed for a period of time in excess of one year, and that DCF undertook reasonable efforts to reunite Jessica Lynn with the respondent mother.
3. No on-going parent-child relationship: Jessica Lynn's CT Page 9480 custody was assumed by the petitioner on the day she was born, and she was placed in a state-licensed foster home four days later. She has been in DCF custody for all of her life. Under C.G.S. § 17a-112 (b)(4), an "on-going parent child relationship" is defined to mean "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral or educational needs of a child." In the present case, as in the case of In re ValerieD., supra, 534, the Petitioner's appropriate actions in assuming custody of the child (which precluded the mother from providing daily care) were the cause of the respondent's inability to establish an ongoing relationship with the child. In light of theValerie D. decision, this statutory ground is inapplicable to Donna S. Furthermore, the evidence at trial establishes that the respondent had fairly regular visits with her child over the years. The petitioner did not prove by clear and convincing evidence during this proceeding that Jessica Lynn has had no present positive memories or feelings concerning the respondent for a period of time in excess of one year prior to the date the termination petition was filed. (See In re Juvenile Appeal
(84-6), 2 Conn. App. 705, 709, 483 A.2d 1101 (1984). Accordingly, this count of the petition against Donna S. is also dismissed.
 DISPOSITION (Based on facts through the conclusion of trial)
Having determined that the petitioner has proven at least one ground for termination against each of the respondents, the court now turns its attention to the dispositional phase of this non-bifurcated trial. The petitioner must prove, also by evidence that is clear and convincing, that it is in the best interests of the child to terminate each respondent's parental rights.
Jessica Lynn will celebrate her fourth birthday on September 24, 1993. Other than the few days she spent in the hospital after she was born, she has lived all her life in a state foster home. Stephen G., the biological father, has not had any contact with Jessica Lynn since the child was approximately one year old. Dr. Freedman has stated that the child would not know him. The child has had ongoing visits with Donna S., and recognizes her. It is clear, however, that Jessica Lynn regards her foster parents, who are the only care givers she has ever known, as her mother and father. Dr. Freedman has opined that it would "traumatize" Jessica Lynn to remove her from this foster home. DCF's long-term permanency plan is to place Jessica Lynn for adoption with the CT Page 9481 foster parents, Christopher and Lisa O. The foster parents have expressed an interest in adopting the child. The child has adjusted well in the foster home and is developmentally on target. The DCF social study indicates that "The bond between this lovely little girl and the [foster family] is firmly established." (Petitioner's Exhibit 1, Page 9).
Both Dr. Freedman and Mary Dunion, the DCF social worker, have stated that Jessica Lynn needs the stability of a permanent home. Ms. Dunion noted in a January 1996 social study that:
 "Jessica is at a vulnerable age and is in need of permanency in order to maintain an appropriate relationship with her caretakers. She needs a family where she can feel secure in knowing that she can remain within the family without risk of being placed in another home." (Petitioner's Exhibit 1, Page 26).
As noted at length herein, Donna S. suffers from serious intellectual deficits which have rendered her incompetent by herself to appropriately parent any child. Dispositional evidence introduced during the trial established that Donna S. had three other children before Jessica Lynn was born. Her parental rights with respect to a daughter born in 1984 were terminated. Guardianship of a son who was born in 1988 has been transferred to Donna S.'s brother and sister in law. As noted above, Stephen G. has custody of the child Elizabeth, who was born in 1992. (Petitioner's Exhibit 1, Pages 5-6). The respondent's demonstrated inability to provide for the care and custody of these older children lends factual support to Dr. Freedman's conclusions and recommendations about Jessica Lynn's best interests.
Ms. Dunion also wrote in her January 1996 social study that the mother has been consistently unable to make the changes in her life which would be necessary in order to parent Jessica Lynn:
 "[Donna S.] has made no efforts to adjust the circumstances in her life which would make it in her daughter's best interest to be returned home. [Donna S.] voluntarily moved out of Connecticut distancing herself from her child, in order to remain with her current husband. She has shown poor judgment in her choice of partners in the past by living with assaultive men and yet has again chosen to live with a man she admits physically abuses her. She does not appear capable of understanding the dangers CT Page 9482 to a child living in such a situation." (Petitioner's Exhibit 1, Page 26).
On August 29, 1996, Donna S. told DCF workers during an visit there that she had attempted unsuccessfully to leave her husband on August 1, 1996. (Petitioner's Exhibit 2, Pages 30-31). She indicated that her husband still hits her, has a "30/30" rifle,[4] and has threatened her with that weapon. She accepted a DCF offer of transportation to a shelter in Danielson, Conn. William S. was present at the DCF offices, and refused to allow the respondent to take their daughter Anne with her to the shelter. (Petitioner's Exhibit 1, Page 31). Donna S. went to the shelter, but returned shortly afterwards to the New Bedford home, where she was residing at the time of this trial.
Based upon the totality of all the evidence presented, the court finds that the Petitioner has established by clear and convincing proof that it is in the best interests of Jessica Lynn, who has languished in the limbo of foster placement for more than three and one half years, that the parental rights of Stephen G. and Donna S. be terminated.
Before this court may enter judgment, it is required by C.G.S. § 17a-112 (d) to make the following factual findings:
1. Services offered: The court finds by clear and convincing evidence that the petitioner, under all the facts and circumstances of this case, offered reasonable and appropriate rehabilitation services to both respondents. Stephen G. was offered visitation and participated in Dr. Freedman's first psychological evaluation. His subsequent relocation to South Carolina and failure to advise DCF of his whereabouts made it impossible for the petitioner to provide any other services. While she was residing in this state, Donna S. was involved with the Department of Mental Retardation. A neurological evaluation was performed for the purpose of assessing her eligibility for assistance from that agency. After the mother voluntarily moved to Massachusetts in August 1994, the involvement of the Connecticut DMR ended. The respondent mother's relocation to New Bedford, Massachusetts made it more difficult for the petitioner to provide her with services. Despite this, DCF had some contact with the Massachusetts DMR, sent a letter to the mother providing the names and addresses of local agencies where she could get counseling and parenting assistance, and provided the names of agencies in Connecticut and Massachusetts (at William S.'s CT Page 9483 request) where the husband could obtain sexual offender treatment. Neither Donna S., nor her spouse, contacted any of the agencies referred to in the correspondence sent by DCF. DCF offered Donna S. supervised visitation, and offered to transport Jessica Lynn to and from New Bedford for parental visits if the respondent could document that her medical condition precluded travel.
2. Reasonable efforts to reunite: The court finds as proven by clear and convincing evidence that the petitioner made reasonable efforts to reunite both respondents with the child. Dr. Freedman evaluated Stephen G. and found him to be a candidate for Jessica Lynn's custody. He precluded that possibility by breaking off visits with the child and dropping out of her life completely when he moved to South Carolina. DCF consistently offered Donna S. visitation and attempted to guide the mother to services in Massachusetts.
3. Court orders: No court orders were entered in this case. Court-approved expectations for Donna S. were set at the Superior Court for Juvenile Matters in Montville on June 15, 1994 when the child was committed as a neglected child. No expectations were set for the respondent Stephen G. The court notes the biological father's last visit with Jessica Lynn occurred during July, 1994, and he moved to South Carolina without informing the petitioner during October 1994.
4. Feelings and emotional ties with parents and caretakers:
Jessica Lynn has had no contact with her biological father since she was one year old. Per Dr. Freedman, she would not know him now. Since being placed in foster care, the child has had visits with her biological mother and knows who she is. The child regards her foster parents as her mother and father and has bonded with them.
5. Age of child: Jessica Lynn is three years old. She will turn four on September 24, 1997.
6. Parental efforts to adjust circumstances, conduct andconditions: The court finds that neither of the respondents has made sufficient efforts to adjust their circumstances, conduct or conditions in order to make it in the best interest of Jessica Lynn that she be returned to either parental home in the foreseeable future. CT Page 9484
7. Impediments to maintaining a meaningful relationship: The court finds that no unreasonable action of any individual or agency, and no adverse economic circumstance of either parent, prevented either of the respondents from maintaining a meaningful relationship with Jessica Lynn.
JUDGMENT AND ORDERS
Having considered the seven factors enumerated above, having found that at least one statutory ground for termination of parental rights was proven by clear and convincing evidence against each respondent, and having further found based upon clear and convincing evidence that a termination would be in the best interests of the minor child, it is hereby ORDERED that the parental rights of Stephen G. and Donna S. with respect to the minor child Jessica Lynn B. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent of Jessica Lynn B. for the purpose of securing an adoptive home, or other appropriate placement, for her. Said commissioner shall file with this court, no later than 90 following the date of this judgment, a written report of the progress made towards such permanent placement. If adoption has not been finalized by August 1, 1998, then said commissioner is further ordered to file a Motion for Review of Plan for Terminated Child, which shall be heard by the court no later than November 1, 1998.
Dated at Middletown, Connecticut this 13th day of May, 1997.
BY THE COURT
DYER, J.